# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

---

ADVENTIST HEALTH SYSTEM SUNBELT HEALTHCARE CORP.,

       Plaintiff,

   v.

MULTIPLAN, INC.,

       Defendant.

---

Civil Action No.1:23-CV-07031-ER-KP

**<u>ORAL ARGUMENT REQUESTED</u>**

<u>**MULTIPLAN, INC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**</u>

## TABLE OF CONTENTS

Page

**INTRODUCTION**................................................................................................1

**SUMMARY OF THE COMPLAINT'S RELEVANT ALLEGATIONS** .................5

    A.    AHS Provides Medical Services To An Array Of Interchangeable Customers Involving Varying Payment Mechanisms...............................5

    B.    AHS Charges Its OON Patients After The Services Are Rendered, And Negotiates The Specific Amount With The Patient Or Specific Insurance Plan ..................................................................................6

    C.    The OON Pricing That Plans Negotiate Directly Impacts Individual Patients ..................................................................................8

    D.    MultiPlan Provides Its Customizable Cost-Management Services To 700+ Clients Who Retain The Ability To Decide How Or When They Are Used........10

    E.    AHS Admits That MultiPlan's Cost-Management Tools Calculate Above-Cost Reimbursements That Are Profitable For AHS...............................11

    F.    MultiPlan Has A Separate Business As A PPO Network, But It Is Not An Insurance Plan And It Does Not Directly Reimburse For Any OON Claim .........11

**ARGUMENT** .............................................................................................12

I.    MULTIPLAN'S SERVICE CONTRACTS ARE NOT *PER SE* ILLEGAL UNDER A "HORIZONTAL COMPETITOR" THEORY..........................................14

II.    AHS'S "HUB-AND-SPOKE" CLAIM FAILS BECAUSE AHS CANNOT ALLEGE 700+ PAYOR-CLIENTS AGREED WITH EACH OTHER TO DO ANYTHING ......................................................................................17

    A.    AHS Does Not Plead The Who, What, Or Where Of The Alleged Conspiracy ................................................................................19

    B.    AHS Does Not Plead Any Direct Evidence Of A Conspiracy .............................19

    C.    AHS Does Not Allege Any Circumstantial Evidence That Plausibly Excludes That MultiPlan's 700+ Payor-Clients Acted Independently .................21

III.    AHS FAILS TO PLEAD THAT MULTIPLAN'S SERVICE CONTRACTS HARMED COMPETITION IN A RELEVANT MARKET ...............................................27

    A.    AHS Fails To Plead A Properly Defined Antitrust Market ...................................27

    B.    AHS Fails To Allege That Each Of MultiPlan's Bilateral Agreements To Offer Its Cost-Management Tools Was A "Price-Fix" Or Any Restraint Of Trade ......................................................................................31

    C.    AHS Fails To Allege That Each Of MultiPlan's Bilateral Agreements Harmed Competition In Any Relevant Market.................................................32

IV.    AHS FAILS TO PLEAD AN ANTITRUST INJURY ...............................................34

**CONCLUSION** ...............................................................................................35

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*2238 Victory Corp. v. Fjallraven USA Retail, LLC*,
    2021 WL 76334 (S.D.N.Y. Jan. 8, 2021) ........................................................ 16

*AD/SAT, A Division of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999) ........................................................ 24

*Anderson News, L.L.C. v. American Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ........................................................ 13, 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................ 12

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ........................................................ 34, 35

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994) ........................................................ 34

*BCBSM. v. GS Labs, LLC*,
    2023 WL 2044329 (D. Minn. Jan. 30, 2023) ........................................................ 30

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................ 12, 13, 19, 20

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ........................................................ 34

*Brunswick Corp v. Pueblo Bowl-O-Mat*,
    429 U.S. 477 (1977) ........................................................ 34

*Business Electronics Corp. v. Sharp Electronics Corp.*,
    485 U.S. 717 (1988) ........................................................ 16

*City of New York v. Group Health Inc.*,
    649 F.3d 151 (2d Cir. 2011) ........................................................ 28, 31

*Copy-Data Systems, Inc. v. Toshiba America, Inc.*,
    663 F.2d 405 (2d Cir. 1981) ........................................................ 13, 14, 16

*Daniel v. American Board Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005) ........................................................ 34

*Dimidowich v. Bell & Howell*,
   803 F.2d 1473 (9th Cir. 1986) ................................................................ 17

*Electronics Communications Corp. v. Toshiba Consumer Products, Inc.*,
   129 F.3d 240 (2d Cir. 1997) ................................................................... 16

*Franco v. Connecticut General Life Insurance Co.*,
   818 F. Supp. 2d 792 (D.N.J. 2011) ............................................. 17, 29, 30

*Gamm v. Sanderson Farms, Inc.*,
   944 F.3d 455 (2d Cir. 2019) .............................................................. 24, 27

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
   2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) ...................................... 16, 34

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
   386 F.3d 485 (2d Cir. 2004) ................................................................... 32

*Gibson v. MGM Resorts International*,
   2023 WL 7025996 (D. Nev. Oct. 24, 2023). ................................ 22, 23, 26

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
   602 F.3d 239 (3d Cir. 2010) ................................................................... 18

*In re Aetna UCR Litigation*,
   2015 WL 3970168 (D.N.J. June 30, 2015) ............................................. 17

*In re Baby Food Antitrust Litigation*,
   166 F.3d 112 (3d Cir. 1999) ................................................................... 20

*In re High Fructose Corn Syrup Antitrust Litigation*,
   295 F.3d 651 (7th Cir. 2002) ................................................................. 20

*In re Insurance Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ............................................................. 18, 20

*In re Local TV Advertising Antitrust Litigation*,
   2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) .......................................... 26

*In re Musical Instruments & Equipment Antitrust Litigation*,
   798 F.3d 1186 (9th Cir. 2015) ......................................................... passim

*In re Southeastern Milk Antitrust Litigation*,
   739 F.3d 262 (6th. Cir. 2014) ................................................................ 16

*In re Zinc Antitrust Litigation*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ................................................ 18, 20

*In re: Amazon.com, Inc. eBook Antitrust Litigation*,
  2022 WL 4581903 (S.D.N.Y. Aug. 3, 2022) ...................................... 21, 32

*Jeffrey Farkas, M.D., LLC v. Cigna Health & Life Insurance Co.*,
  386 F. Supp. 3d 238 (E.D.N.Y. 2019) .............................................. 9, 10

*Kartell v. Blue Cross Blue Shield of Massachusetts, Inc.*,
  749 F.2d 922 (1st Cir. 1984) ............................................................ 33

*Kelly v. Pearce*,
  178 F. Supp. 3d 172 (S.D.N.Y. 2016) ................................................ 13

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ........................................................................ 14

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (8th Cir. 2009) ........................................................... 30

*Long Island Anesthesiologists PLLC v. United Healthcare Insurance Co. of New York, Inc.*,
  No. 22-cv-04040 (E.D. N.Y. Nov. 21, 2023) ........................... 4, 15, 33, 34

*Marion Healthcare LLC v. Southern Illinois Healthcare*,
  2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) ...................................... 30

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ....................................................... 20, 21

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
  2022 WL 4017895 (W.D.N.Y. Sept. 2, 2022) .................................. 22, 23

*Pacific Recovery Solutions v. Cigna Behavioral Health, Inc.*,
  2021 WL 1176677 (N.D. Cal. Mar. 29, 2021) .................................... 17

*Pacific Recovery Solutions v. United Behavioral Health*,
  481 F. Supp. 3d 1011 (N.D. Cal. 2020) ....................................... 17, 27

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  911 F.3d 505 (8th Cir. 2018) ..................................................... 22, 23

*PepsiCo v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ....................................................... 18, 21

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*,
  917 F.3d 1249 (11th Cir. 2019) ........................................................ 24

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) .............................................................. 32

*Spinelli v. National Football League,*
　96 F. Supp. 3d 81 (S.D.N.Y. 2015) ........................................................................... 32

*Texaco v. Dagher,*
　547 U.S. 1 (2006) ...................................................................................................... 13

*Todd v. Exxon Corp.,*
　275 F.3d 191 (2d Cir. 2001) ..................................................................................... 28

*Virgin Atlantic Airways Ltd  v. British Airways PC,*
　257 F.3d 256 (2d. Cir. 2001) ............................................................................... 33, 34

*Watkins v. Smith,*
　2012 WL 5868395 (S.D.N.Y. Nov. 19, 2012) ......................................................... 13

*Westchester Radiological Associates P.C. v. Empire Blue Cross & Blue Shield, Inc.,*
　707 F. Supp. 708 (S.D.N.Y. 1989) ........................................................................... 35

## INTRODUCTION

Plaintiff AHS is one of the largest hospital systems in the United States, with tens of billions in billed charges annually from over 50 hospitals in nine states.  Its lawsuit seeks to contort antitrust law so as to eliminate the healthcare cost-management services and tools offered by Defendant MultiPlan, Inc. ("MultiPlan") to 700+ payor-clients nationwide, and thereby substantially increase the prices AHS can force patients (and their healthcare insurance plans) to pay for out-of-network ("OON") medical services.  According to AHS, were it not for MultiPlan's services and tools, AHS would have the upper hand in seeking and obtaining payment for OON medical services, such as for emergency room visits and the like, and patients and their insurers would be forced to accept the higher prices that AHS demands for OON services—which are already priced at a substantial premium to contracted Medicare and in-network commercial rates. AHS laments that this world of higher profits ***used*** to be the case, long years past—and it urges the Court, under the mantle of antitrust, to bring back those expensive pre-MultiPlan days.

Using ***antitrust law*** to stifle competitive innovations and thereby gain an upper hand—all to admittedly inflate profits by forcing patients to pay substantially higher prices for the exact same medical services—is as wrong as it sounds.  Each of AHS's three alternative theories of liability— (1) a *per se* "horizontal competitor" theory, (2) a *per se* "hub-and-spoke" conspiracy theory, and (3) a rule of reason restraint of trade theory challenging each agreement between MultiPlan and its healthcare insurance company clients—relies on sleights-of-hand, and none have merit.

*First*, as to its *per se* "horizontal competitor" antitrust claim, AHS does not and cannot establish that MultiPlan's bilateral service contracts with its 700+ payor clients are a *per se* antitrust violation of "horizontal competitors" colluding with each other.  On their face, these contracts simply involve MultiPlan *selling* its tools and services in one capacity to payor-clients operating downstream, who AHS admits use them to bring down the significant price premiums

charged to patients for OON services.  Sales of this nature, as a matter of law, involve vertical conduct that cannot be treated as *per se* illegal.  That is true even if MultiPlan and its payor-clients compete on some other, different level.  But AHS's allegations regarding "competition" between MultiPlan and its clients fall short too.  Unlike its clients, MultiPlan is not a health-insurance plan.  AHS can never *factually* allege that MultiPlan issues health plans to patients, has any insureds or member patients, or provides benefit coverage to or itself pays healthcare claims from patients.  In short, MultiPlan never pays AHS anything for OON services because MultiPlan is not a health insurance plan that insures any patient ever seen at an AHS hospital.  Thus, by definition, the claimed *per se* "horizontal conspiracy" fails because it does not involve any horizontal restraint between horizontal competitors.  AHS's strained attempt to say that MultiPlan and healthcare insurance plans compete in another business line entirely (for PPO networks, which AHS has expressly carved out of this litigation), is of no consequence.  Even if the Court accepts that MultiPlan and its payor-clients compete at some level, somewhere, MultiPlan's sales of its tools and services to insurance plans at most constitute "mixed" vertical-horizontal arrangements that courts evaluate under the rule of reason, a test that AHS fails for myriad reasons set forth below.

*Second,* AHS's *per se* hub-and-spoke conspiracy claim similarly fails.  AHS asserts that when 700+ different insurance plans purchased different cost management services and tools from MultiPlan at various points in time over the past decade or more, they each became co-conspirators with MultiPlan (and one another).  Yet AHS does not plead any facts that plausibly allege these 700+ plans conspired not just with a common partner like MultiPlan, but actually agreed with each other to form an illegal "cartel."  AHS also does not plead a single fact that any of the 700+ payor-clients of MultiPlan ever directly communicated—let alone agreed—to adopt MultiPlan's cost management tools.  Nor does AHS allege circumstantial evidence of parallel conduct and "plus

factors" that suggest that clients engaged in conspiratorial behavior when they each bought a version of MultiPlan's services—to the contrary, it was plainly in the unilateral self-interest of each insurer to lower its payments to hospital providers like AHS on the exorbitant prices for out of network services.  There is not a scintilla of alleged evidence, nor any rational argument, that MultiPlan and its 700+ payor clients all consciously committed to a common scheme designed to achieve an unlawful objective, as the antitrust laws require for liability.

*Third*, AHS also fails to adequately allege any element of its third claim, a fallback rule of reason antitrust claim asserting that each of MultiPlan's bilateral agreements with its payor-clients harmed competition in a relevant antitrust market.   The problems here are pervasive and insurmountable, and they demonstrate why AHS spends so much time trying to manufacture a *per se* claim via its first two theories:  precisely to avoid the Court seeing how flawed AHS's complaint is under standard antitrust rule of reason analysis.   To begin with, ***no*** court has recognized a relevant market like the one proposed here, where AHS suggests that "reimbursements paid by commercial insurers to providers for out-of-network medical services" are themselves a single, standalone, product or service capable of defining a discrete antitrust market.  Compl. ¶ 138, ECF No. 1 ("Compl.").  Indeed, AHS doesn't even try to allege any of the well-established requirements it must in order to properly allege a relevant antitrust market (such as interchangeability and cross-elasticity of demand).  AHS cannot satisfy this most basic of pleading steps because ***there is no such standalone market for "reimbursements" comprised of the sale or purchase of any discrete product or service that any alleged participants in that market could or ever would "compete with each other to buy or sell***.  AHS is just complaining about the method of *payment* for the actual service, AHS's medical treatment, that it already sold earlier on in the process.  Moreover, even if AHS could allege a proper market, it fails to plead any facts showing that each bilateral

agreement between MultiPlan and its payor-clients—where the plans ultimately get to decide how and when to use MultiPlan's services and tools and/or the recommendations they generate—is a restraint of trade prohibited by antitrust law, or had an *actual* adverse effect on competition in the form of reduced demand for provider services or anticompetitive prices.  To the first point, MultiPlan's sales of its tools to clients do not "restrain trade" or "fix" the price of OON medical services at all; insurer-payor clients ultimately can decide how they use MultiPlan's tools in any interactions with AHS; and even where MultiPlan's clients do use MultiPlan's services to propose a reimbursement fee to providers, those proposals are still just the opening volley in those insurer-payor clients' individual interaction with providers.  Additionally, to the extent that MultiPlan's recommendations ultimately help its clients achieve lower prices to consumers, that is unequivocally not an adverse outcome that flows from any harm to competition.

*Finally*, as the above makes clear, AHS cannot meet its burden to establish antitrust injury—a threshold requirement—because AHS's inability to obtain a supracompetitive price is not the type of injury the antitrust laws were meant to prevent, and any such "injury" does not, in any event, result from any competition-reducing aspect or effect of MultiPlan's behavior.

This Court should not allow antitrust law to be twisted so as to resuscitate the windfall profits AHS so badly wants.  Indeed, just three weeks ago, a district court in this Circuit dismissed similar claims, holding that the purchase of MultiPlan's cost-management services by United Healthcare (an insurer) was not an antitrust horizontal conspiracy, and that MultiPlan's services had not harmed competition when they led to *lower* OON reimbursement rates.  Or. at 9-15, *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y., Inc.*, No. 22-cv-04040 (E.D. N.Y. Nov. 21, 2023), ECF No. 50 ("Or.").  Here, if anything, AHS's factual allegations are even more infirm, in that they purport to describe an unbelievably large conspiracy that operated to

*increase* competition and had clear procompetitive effects: MultiPlan's entry into the cost-management business has created more options for plans and has lowered costs to subscribers. *Cf.* Compl. ¶¶ 12, 116-17, 122, 271-73.  These are outcomes antitrust law does not prohibit but ***protects***.  Accordingly, MultiPlan respectfully requests that the Court dismiss the complaint.

## SUMMARY OF THE COMPLAINT'S RELEVANT ALLEGATIONS

### A.     AHS Provides Medical Services To An Array Of Interchangeable Customers Involving Varying Payment Mechanisms

Hospitals, physicians, and other providers like AHS can "sell" their healthcare services to an array of patient-customers.  Compl. ¶¶ 2, 3, 140, 243.[1]  Among other options, AHS can market its business to uninsured patients who will pay the providers' fees entirely out-of-pocket.  *See, e.g, id.*  AHS can also market its services to patients insured by government payors like Medicare, Medicaid, and Tricare.  *Id.* ¶ 140.  And AHS can market and sell its services to commercially-insured patients whose insurance plan will reimburse the cost in a variety of ways, depending on whether the patient is seen by an "in-network" provider (via contracted networks such as PPOs or HMOs) or by an "out-of-network" provider.  *Id.* ¶¶ 2 & n.1, 3.  A provider that is "in-network" with a plan typically has contracted ahead of time with that plan about the terms and reimbursement rates that will govern the provider's medical treatment of that plan's subscribers; an "in-network" contract between a provider and a plan may also establish that in-network providers comply with certain quality and credentialing requirements when providing medical services to the plan's subscribers.  *Id.* ¶¶ 2, 45.  For subscribers, seeing an "in-network" provider typically ensures that they can obtain treatment at a reduced rate.  By contrast, when a provider is "out-of-network" with a plan, that means that often (although not always), the terms on which that provider will provide medical treatment for a patient-subscriber are not pre-determined by contract and must instead be

---

[1] MultiPlan treats the complaint's factual allegations as true only for purposes of this motion.

resolved between the provider and the plan after-the-fact—often at a "higher" rate. *Id.*

AHS does not dispute that it sells its services to these groups and will accept payment from all of them. *See id.* ¶¶ 2-3, 140, 243.  Nor does AHS deny that it considers non-commercially insured patients, or commercially-insured patients who are not "out of network" to be acceptable— and thus, interchangeable or reasonably substitutable—"buyers" of its services. *E.g.*, *id.*

**B.      AHS Charges Its OON Patients After The Services Are Rendered, And Negotiates The Specific Amount With The Patient Or Specific Insurance Plan**

In instances where a provider like AHS sells its medical services to a patient on an OON basis, the provider will thereafter submit a claim to the patient's insurance plan for reimbursement. *Id.* ¶ 151.  The plan and AHS may then haggle over the appropriate payment amount, and if neither side agrees to a specific amount, the plan may just provide its standard coverage for OON services and the subscriber may be billed for the balance. *Id.* ¶¶ 190, 232, 274.

There are no allegations that a provider such as AHS is ever mandated to accept the counter-offer reimbursement amount suggested by the plan.  Nor does AHS allege with any *facts* that its own initial demand to a plan/payor reflects the "right" price for that treatment, or an amount that best correlates with the cost or value of the actual treatment provided.  To the contrary:  AHS does not allege anything about the prices that AHS initially demands as payment from patients and their insurers for OON services and/or how those prices are calculated.  It does not allege, for example, the margin spread reflected by its demands, how much profit AHS would make from a blanket acceptance of that initial demand, whether its demand is higher than what a Medicare or in-network patient would pay for the exact same service (and if so, by how much), whether the profit margin achieved by AHS's demand for payment in a specific claim differs from similar claims issued across hospital, region, medical specialty/service offered, insurance plan, or anything else.  AHS thus includes no well-pleaded factual allegations showing that anything *lower* than its

initial demand to a payor is, in any way, an objective "underpayment" for the treatment at hand.

Despite this, AHS admits that it is nonetheless able to significantly push back against the counter-offer prices suggested to it by MultiPlan's clients when the parties engage in each individualized discussion over the proper OON reimbursement for a given claim. Compl. ¶¶ 190, 273-74. AHS states that although an insurance plan using MultiPlan's tools often responds to AHS's high initial demand with a reduction of approximately 80% - 90%, the ensuing negotiation can result in AHS succeeding in forcing the insurer to pay the vast bulk of its demand, and to accept only a 30% reduction off the initial negotiating position of AHS. *Id.* ¶¶ 273-74. To put actual (if hypothetical) numbers on those allegations: AHS demands a patient pay $1,000 for a particular OON service, the insurer (using MultiPlan's offerings) offers $100 - $200 as the fair price, and AHS succeeds in getting the insurer to ultimately agree to $700.[2]

In the years before MultiPlan's entry into this industry, the complaint makes clear that insurers used to have even less information, and thus less ability, to push back against AHS's initial payment demands. *Id.* ¶¶ 121, 127. For decades prior to MultiPlan's entry into this space, plans and providers trying to negotiate OON reimbursements looked to benchmarking databases which aggregate claims information from both plans and providers, to estimate what a "usual, customary and reasonable" ("UCR") rate might be for the provider service at issue. *Id.* ¶¶ 121, 127, 223. The OON estimates generated by earlier versions of these benchmarking databases likewise served as

---

[2] Again, there are no allegations, among other things, as to where the average payments net out, how such payments differ across regions and hospitals or among insurers, and how the ultimate OON pricing for any patient's services compares to the amounts AHS charges a patient identically situated except for whether they are covered on an in-network basis, or by Medicare, etc. There are also no allegations about how significant this OON pricing category is (and what percentage of AHS's business it represents), as well as how the negotiated OON price compared to the comparator Medicare or in-network categories, or whether MultiPlan's pricing tools impacted even 1% of AHS's tens of billions of total hospital charges during the relevant period.

a jumping-off point for negotiations between a plan and provider, *id.* ¶ 121, but as AHS notes, were "uncontrolled" and formed the basis of numerous court challenges. *Id.* ¶¶ 127-28, 186. Tellingly, AHS does not allege any evidentiary facts that these legacy benchmarking databases ever generated "competitive" rates that were the product of competition *between payors for AHS's services*. AHS does not allege facts, for example, that it ever used UCR rates to play one plan or payor off another, using the threat of non-treatment to those plan's subscribers, to obtain a higher reimbursement amount than it otherwise could have. Nor does AHS allege that it ever refused or considered refusing to treat any commercially-insured patient because it believed that their insurance-plan paid inadequate "UCR-based" rates relative to another patient's payor (even in hypothetical instances where AHS legally could do so). AHS does not plead a single fact that it ever used competition between any plan, in any identifiable instance, to obtain a higher "UCR-based" reimbursement rate than AHS could have otherwise commanded absent such "competition." *Cf. id.* ¶¶ 127-28, 134. Nor does AHS allege a single fact indicating that insurers ever agreed to reimburse AHS at higher rates than they otherwise would for OON services, in order to obtain some advantage for separate "in-network" claims.

## C. The OON Pricing That Plans Negotiate Directly Impacts Individual Patients

As AHS alleges, when a plan pays an OON reimbursement, that fee is funded by a combination of subscriber premiums and costs split between the subscriber and plan. *Id.* ¶¶ 45, 122. Accordingly, if plans increase premiums in response to rising OON reimbursements, subscribers will feel that cost. *Id.* And, because subscribers to a PPO plan typically pay a larger percentage of a providers' bill when that provider is "out of network" instead of "in-network," subscribers can end up paying a substantially higher amount (in addition to paying increased premiums) when OON reimbursements increase. *See id.* ¶ 45. A subscriber who may be responsible for, say, 50% of out-of-network costs will end up paying a dramatically different

amount if the overall reimbursement fee of an out-of-network claim is $275,000 versus, say, $12,000. *See, e.g.*, *id.* ¶¶ 45, 95-97. AHS alleges that insurance plans do not pass on *their* portion of the joint savings to customers but alleges nothing about the patient's own interest in having their portion of the ultimate payment to AHS for OON services reduced. *Cf. id.* ¶¶ 10, 13, 71.

AHS's own complaint provides a striking illustration of the impact of such payment negotiations on patients. *Id.* ¶ 95. AHS alleges that Jeffrey Farkas, MD, LLC submitted a claim to a healthcare payor with whom MultiPlan had a contract, with a bill totaling $332,300 for one day of work. *Id.* MultiPlan—acting on behalf of its client, Cigna, in this instance—relayed Cigna's offer to reimburse Dr. Farkas $12,407 for that work, which was well over what Medicare would have paid, Dr. Farkas rejected Cigna's offer and the plan ultimately sent him a check for $6,893.20 as the "covered amount" under the applicable plan. *Jeffrey Farkas, M.D., LLC v. Cigna Health & Life Ins. Co.*, 386 F. Supp. 3d 238, 241-42 (E.D.N.Y. 2019) (granting defendant plan administrator's motion for summary judgment on both counts, including that plan administrator did not abuse its discretion when it decided not to fully reimburse).[3] As the court noted in rejecting Farkas' legal challenge, the offer made using MultiPlan's tools was *three times more than what* an individual on Medicare would have been charged. *Id.* at 246-47. This, the Court concluded, was a valid reimbursement amount for the provider to receive. *Id.* To the contrary, had Cigna (without the benefit of MultiPlan's cost-management tools) simply agreed to reimburse what Dr. Farkas demanded in the first instance, the patient would have faced a bill calculated based on an astronomically higher windfall demand of $332,300—instead of the much smaller amount that Cigna instead proposed (and the Court upheld as reasonable)—a difference of over $300,000 for

---

[3] Pursuant to Federal Rule of Evidence 201, Defendant requests the Court take judicial notice of these facts, set forth in the *Farkas* court's order and memorandum: 386 F. Supp. 3d 238.

purposes of that patient-subscriber's ultimate responsibility.  *See id.*; *see also* Compl. ¶ 95.

    **D.**    **MultiPlan Provides Its Customizable Cost-Management Services To 700+ Clients Who Retain The Ability To Decide How Or When They Are Used**

MultiPlan built its cost management business against this backdrop.  Since 2006, MultiPlan and its subsidiaries have pioneered cost-management tools and services which are designed to calculate appropriate OON reimbursement rates for a plan, based on that plan's historical claims data and information that providers have submitted to government agencies like the U.S. Centers for Medicare and Medicaid Services.  Compl. ¶¶ 63–70, 77-80, 145.  What MultiPlan offers is essentially an upgraded, customizable alternative to the legacy databases, plus a service that allows its payor-clients to outsource the actual negotiations with providers to a vendor, MultiPlan, acting on their behalf, with the ultimate reimbursement decision still resting with the payors.  *Id.*

When a payor contracts with MultiPlan, it obtains access to MultiPlan's tools and services, which it ultimately decides how best to use (or not use).  *Id.* ¶¶ 74, 76, 85, 217.  Critically, the service that MultiPlan provides to each client is not one-size-fits-all.  It is customizable by the payor-client to fit each one's individualized pricing preferences.  *Id.* ¶¶ 63, 70, 76, 85, 102-08.  A payor-client, for example, may select parameters in MultiPlan's tools to generate more aggressive reimbursement recommendations or to provide recommendations that fit different parameters.  *Id.* Different payor-clients thus can—and do—use MultiPlan's cost-management tools in different ways to arrive at different reimbursement recommendations that serve as the starting point for each client's negotiation with a provider.  *Id.*

Contracting with MultiPlan does not obligate MultiPlan's 700+ payor-clients to pay a pre-determined price or to agree with MultiPlan or anyone else about the final amount those 700+ payors will pay for any OON service.  Nor does AHS allege that MultiPlan mandated that all of its 700+ clients agree to any sort of exclusive provision, or that MultiPlan's contracts preclude or

restrict its 700+ clients from using another cost management methodology.  AHS also does not

deny that MultiPlan's clients decline to use the result of MultiPlan's tools some of the time when

deciding a final OON reimbursement.  *Cf. id.* ¶¶ 11, 273-74. AHS cannot allege otherwise, because

it knows that for much of its OON list prices, there is no pushback at all by the payor-clients.

On the flip side, the complaint makes clear that healthcare providers, such as AHS, are not

***required*** to accept any particular pricing offer made as a result of an insurance plan using

MultiPlan.  Instead, AHS and the insurers are free to negotiate and—if they cannot reach

agreement—move on to dispute resolution such as arbitration where applicable or, in the case of

the Farkas example above, to litigation (just as they could before MultiPlan pioneered its product).

*Id*. ¶¶ 11, 95, 232.

> ### E.    AHS Admits That MultiPlan's Cost-Management Tools Calculate Above-Cost Reimbursements That Are Profitable For AHS

By design, however, MultiPlan's cost-management tools produce recommendations that

allow providers both to recover their costs and turn a profit for their OON services.  *Id.* ¶¶ 77-79.

MultiPlan does this by relying on providers' own publicly-available cost information, which it

then uses to calculate a reimbursement proposal designed to cover a provider's costs and profit

margin.  *See id.*  AHS thus does not allege that MultiPlan's services result in below-cost pricing,

or in fact are ever below either Medicare or commercial in-network rates.  AHS mainly objects to

negotiating with insurers about its reimbursement rates *at all*.  *Id.* ¶¶ 74, 190, 232, 274.

> ### F.    MultiPlan Has A Separate Business As A PPO Network, But It Is Not An Insurance Plan And It Does Not Directly Reimburse For Any OON Claim

As MultiPlan's securities filings (cited at length in the complaint) make clear, MultiPlan's

sales of its cost-management tools and services to customers account for the majority of its overall

business.  *Cf. id., e.g.*, ¶ 294.  In addition to MultiPlan's cost-management business, MultiPlan

also runs a legacy PPO network business in which it creates networks of providers, which it then

contracts with insurance plans and payors for access. *Id.* ¶¶ 4, 43-46. Those providers thereafter provide in-network services to the insurance plans and/or payor-subscribers that utilize MultiPlan's PPO network. *Id.* ¶¶ 50-51, 58. Some—but certainly not all, and not even most—of MultiPlan's payor-clients are themselves vertically integrated and also create and sell PPO networks. *See id.* ¶¶ 54, 57. The complaint alleges that MultiPlan and a small subset of its plan customers compete to recruit providers to join their networks. *Id.* Yet AHS also asserts repeatedly that its claims relate only to payment for out-of-network services. *Id.* ¶¶ 1-7 & n.2.[4]

MultiPlan is not an insurance *plan*—it does not offer any plan to any subscriber, collect premium payments, have any insured or member patients, or provide benefit coverage to or pays healthcare claims from patients (including those seen at an AHS hospital). *Cf. id.* ¶¶ 48-53. AHS also never alleges that it submitted any OON claim directly for payment by MultiPlan itself, or that MultiPlan negotiated any OON price on its own.

## ARGUMENT

To survive dismissal under Fed. R. Civ. P 12(b)(6), AHS must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007));

---

[4] Indeed, AHS doubled down on this in its pre-motion response letter, stating that it is challenging a conspiracy related to "out-of-network reimbursements that, by definition, are not governed by any contract, much less by an arbitration agreement between AHS and MultiPlan." Letter, ECF No. 35 at 2 n.2. Yet AHS references in-network issues throughout its complaint, such as MultiPlan's separate PPO network services business and allegations that the out-of-network "cartel" is expanding to include "in-network" payments. Compl. ¶¶ 257-68. AHS cannot have it both ways: if this case is about in-network services, and by extension the many written network agreements between AHS and MultiPlan that AHS admits contain arbitration clauses, then this dispute should have been brought in arbitration. MultiPlan does not possess any of the agreements AHS may have with the "Co-Conspirator" health insurers AHS strategically avoids naming as defendants. *Id.* ¶ 54. Only AHS knows whether those agreements contain arbitration clauses that cover various issues raised here, and MultiPlan reserves all rights to compel arbitration should AHS's filings make clear that arbitration of any portion of this case is warranted.

*Twombly*, 550 U.S. at 570.  Although courts must accept "as true all factual allegations," courts "need not credit 'mere conclusory statements' or 'threadbare recitals of the elements of a cause of action.'"  *Kelly v. Pearce*, 178 F. Supp. 3d 172, 177-78 (S.D.N.Y. 2016) (citation omitted).

To state a claim under Section 1, a plaintiff must plead with sufficient facts (i) a contract, combination, or conspiracy that (ii) unreasonably restrains trade.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012).  As to the first inquiry—the requisite agreement—a complaint must contain allegations that, if proved, would "reasonably tend[]" to show that defendants shared "a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Id*. at 184 (quotation omitted).  It also "must provide 'some factual context suggesting [that the parties reached an] agreement,' not just facts that would be 'merely consistent' with an agreement."  *Id.* (alteration in original) (quotation omitted).  Allegations of "parallel conduct that could just as well be independent action" are not enough.  *Twombly*, 550 U.S. at 557.

With respect to the second inquiry—whether the alleged agreement unreasonably restrains trade—courts "presumptively appl[y]" the "rule of reason" analysis.  *See Texaco v. Dagher*, 547 U.S. 1, 5-6 (2006).  Under the rule of reason analysis, it is plaintiff's burden to "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market."  *Watkins v. Smith*, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012), *aff'd*, 561 F. App'x 46 (2d Cir. 2014).  Courts apply the alternative "*per se*" analysis— which, unlike the "rule of reason" standard, treats conduct as presumptively illegal without inquiry into its actual impact on competition—only in extremely limited scenarios where the conduct at issue is "manifestly anticompetitive" and "lack[s] any redeeming virtue" and thus can be deemed illegal "without elaborate inquiry as to the precise harm [it] caused or the business excuse for [its] use."  *E.g.*, *Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 408-09 (2d Cir. 1981)

(quotations omitted).  As discussed below, applying the proper standard, AHS has not met either requirement to state a Section 1 claim, under any of its claimed theories of antitrust liability.

## I.      MULTIPLAN'S SERVICE CONTRACTS ARE NOT *PER SE* ILLEGAL UNDER A "HORIZONTAL COMPETITOR" THEORY

In its first attempt to plead a Section 1 violation, AHS contends that MultiPlan's 700+ alleged supply and/outsourcing agreements with its payor-clients is a horizontal, *per se* illegal price-fixing conspiracy, and every entity that entered one of these bilateral agreements is part of an illegal cartel.  Compl. ¶¶ 298-317.  This iteration of the claim should be dismissed outright. The alleged conduct here—MultiPlan's sale of its cost-management tools and services to 700+ payor-clients via hundreds of supply and outsourcing agreements that AHS cannot adequately plead are all anything other than unrestricted and non-exclusive—consists of presumptively lawful *vertical* agreements that must be analyzed under the rule of reason.  *See*, *e.g.*, *id.* ¶¶ 69, 70, 72-73, 84; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 886-87, 899, 907 (2007) (vertical price restraints should be evaluated under the rule of reason).

AHS cannot seriously dispute this.  It nonetheless urges the Court to label these agreements as "horizontal" in order to trigger the *per se* standard of review, because AHS alleges that MultiPlan and some (though not all) of its vertically-integrated payor-clients compete in the context of MultiPlan's separate PPO network business.  Compl. ¶¶ 54-55, 300-02.  But even accepting AHS's allegations that MultiPlan and its clients compete in the PPO network space, controlling law does not support analyzing MultiPlan's services contracts under the *per se* standard.  *See, e.g.*, *Copy-Data Sys., Inc.*, 663 F.2d at 408-09, 411.

To begin, AHS's conclusory characterization of MultiPlan's relationship to its clients as purely "horizontal" is contradicted by AHS's own allegations and recent case law in this Circuit. AHS's allegations of "competition" mostly center on the relationship between MultiPlan and its

customer, UnitedHealth, but another court in this Circuit just held that "United and MultiPlan . . . are not horizontal competitors" and any services contract between them relating to OON network reimbursements does not constitute "a conspiracy let alone a horizontal conspiracy."  Or. at 12, *Long Island Anesthesiologists*.  So too here.  As the complaint makes clear, MultiPlan operates at different levels of the supply chain in its different businesses.  *See, e.g.*, Compl. ¶¶ 46, 63, 67-68. In its business creating PPO networks, MultiPlan acts as a middleman, recruiting providers to join its PPO networks, which MultiPlan then markets to plans or other payors.  *Id.* ¶¶ 46-48, 51, 53, 61.  As AHS alleges, MultiPlan competes against other PPO networks (including those created by a small subset of vertically-integrated insurance plans) to recruit providers to join its PPO network and provide in-network services at in-network, contracted prices, to payors with access to the PPO network.  *Id.* ¶¶ 54-55, 57-58, 300-01.  In its primary cost-management business, meanwhile, MultiPlan operates entirely upstream, selling its tools and services to insurance plans which both help those customer plans calculate a fair reimbursement price for OON services, and allows them to outsource to MultiPlan the labor involved with negotiating directly with providers.  *Id.* ¶¶ 69, 70, 72-74, 84.  MultiPlan does not (and has never) operated downstream in this space:  it is not an insurance *plan* that itself buys cost-management tools, nor is it a payor that itself directly reimburses providers for any OON services.  *Cf. id.* ¶¶ 48-53.  AHS does not allege with facts, for example, that AHS has ever submitted a claim for OON reimbursement directly to MultiPlan.

Thus, even if the Court accepts that MultiPlan and some small subset of vertically-integrated insurance plans "compete" as part of their PPO network businesses, the relationship between MultiPlan and these plans are, at most, "mixed vertical and horizontal relationships" that courts in this Circuit overwhelmingly have held "must be evaluated under the rule of reason." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 2011 WL 1044898, at *2 (S.D.N.Y. Mar. 10, 2011), *aff'd*

*on other grounds*, 711 F.3d 68 (2d Cir. 2013); *see also 2238 Victory Corp. v. Fjallraven USA Retail, LLC*, 2021 WL 76334, at *5 (S.D.N.Y. Jan. 8, 2021) ("Because the Complaint describes a mixed vertical and horizontal relationship between [defendants], any agreement between them is scrutinized under the rule of reason . . . ."); *cf. Elecs. Commc'ns Corp. v. Toshiba Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997); *Copy-Data Sys.*, 663 F.2d at 408-09, 411 (supply restrictions imposed by vertically-integrated supplier that sold technology to a distributor that also directly competed against the supplier downstream were not *per se* illegal despite the mixed vertical and horizontal aspects to the parties' relationship).

This is particularly true because none of the allegations regarding MultiPlan's cost management contracts with plans—which form the basis of AHS's Section 1 case—relate to their role as competitors.  *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730-31 (1988) (whether agreement is horizontal or vertical depends on whether defendants entered the agreement as "competitors" or as "firms at different levels of distribution").  AHS's allegations instead relate to MultiPlan's upstream role as a seller of cost-management tools and services to payor-clients, who operate downstream as buyers.  Compl. ¶¶ 63, 68, 72, 110, 112-13, 115, 163 (acknowledging that alleged co-conspirators are in a customer-vendor relationship with MultiPlan).  These are basic vertical agreements with many potential competitive benefits for clients—including more precise estimations of OON reimbursements amounts that allows plans and subscribers to save costs, and increased efficiencies for plans that can outsource negotiations to MultiPlan—that courts analyze under the rule of reason regardless of whether the parties otherwise compete in aspects of their relationship.  *See In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272-74 (6th. Cir. 2014) (alleged conspiracy between dairy cooperative and milk processor that consisted of supply agreements was not *per se* illegal, even though defendants also allegedly competed, because agreements offered

many potential efficiencies and the "substantial vertical elements" of the parties' relationship were

"too significant . .. to agree [] that the essence of the conspiracy was horizontal") (quotation

omitted); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1480-81 (9th Cir. 1986) (agreements

between dual-distributor that operated at multiple levels of the supply chain and distributor were

not *per se* illegal under the Sherman Act), *modified on denial of rehr'g*, 810 F.2d 1517 (9th Cir.

1987).  AHS has not identified any case that supports a radical departure from this well-settled

precedent.  Because the law simply does not treat MultiPlan's service agreements with its clients

as *per se* illegal, these contracts cannot provide the basis for AHS's claim that MultiPlan and its

700+ payor-clients formed an illegal horizontal cartel.[5]  And because AHS only pleads Count 1 as

a *per se* antitrust violation—and does not attempt to plead the necessary elements of a rule of

reason claim that would otherwise be necessary for that claim to survive dismissal—Count 1 fails.

## II.  AHS'S "HUB-AND-SPOKE" CLAIM FAILS BECAUSE AHS CANNOT ALLEGE 700+ PAYOR-CLIENTS AGREED WITH EACH OTHER TO DO ANYTHING

Count 2's "alternative" hub-and-spoke theory of *per se* liability fares no better.  AHS's

alternative *per se* theory appears to be that, even if the Court rejects (as it must) the claim that

MultiPlan's client contracts themselves constitute an illegal *per se* conspiracy—because, as

explained *supra*, MultiPlan is vertically related to each of its payor-clients and each of its supply

agreements at most constitute a vertical restraint—MultiPlan nonetheless violated Section 1 for a

separate reason by orchestrating an overarching horizontal conspiracy over a two-decade period

---

[5] AHS implicitly acknowledges that its attempt to characterize MultiPlan's supply and outsourcing agreements as horizontal price-fixing is not a principled stance based on the facts or law but rather is a means to distinguish this case from the raft of decisions that have rejected similar attempts to challenge under Section 1 plans' lawful use of pricing technologies to negotiate out-of-network reimbursements.  Letter, ECF No. 35 at 2 n.3.  *See also Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1023-25 (N.D. Cal. 2020); *In re Aetna UCR Litig.*, 2015 WL 3970168, at *19-23, 24-25 (D.N.J. June 30, 2015); *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*, 2021 WL 1176677, at *12 (N.D. Cal. Mar. 29, 2021); *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 832 (D.N.J. 2011), *aff'd in relevant part*, 647 F. App'x 76 (3d Cir. 2016).

between and *among* the hundreds of payor-clients that buy MultiPlan's cost management services. In AHS's telling, this separate, horizontal agreement is itself a sufficient basis for holding MultiPlan liable for a *per se* violation of the antitrust laws.  Compl. ¶ 36 ("[E]ach health insurance company that has executed an out-of-network repricing agreement with MultiPlan . . . has participated in the MultiPlan Cartel.").

Courts commonly refer to a conspiracy where an entity at one level in the market structure coordinates an agreement among competitors at a different level of the market structure as a "hub and spoke" conspiracy, and it has "a long history in antitrust jurisprudence."  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc*., 602 F.3d 239, 255 (3d Cir. 2010).  To plead a *per se* Section 1 conspiracy in that factual setting against a "hub" like MultiPlan (that is vertically related to the "spokes"), AHS was required to allege evidentiary facts that plausibly suggest that MultiPlan's **700+** clients conspired *not just with a common partner* like MultiPlan (*i.e.* the "hub"), but ***actually agreed with the others*** ("the spokes") to form an illegal "cartel."  This element is often referred to as the "rim" around the wheel, and it is a required element of pleading the existence of a hub-and-spoke conspiracy that courts will treat as illegal *per se* (and that can provide a cognizable basis for holding the vertically-related "hub" liable for a horizontal conspiracy).  *See, e.g.*, *PepsiCo v. Coca-Cola Co.*, 315 F.3d 101,109-10 (2d Cir. 2002) (plaintiff could not sustain *per se* conspiracy claim without establishing that the alleged competitors conspired not just with the defendant but with each other); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) ("Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) ("[T]he critical issue for establishing a *per se* violation with the hub-and-spoke

18

system is how the spokes are connected to each other.").  AHS cannot make that required showing.

**A.     AHS Does Not Plead The Who, What, Or Where Of The Alleged Conspiracy**

As a threshold issue, AHS does not allege even the bare minimum facts to show the existence of any sort of conspiracy between and among MultiPlan and its clients.  A complaint claiming conspiracy must provide "'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement."  *Anderson News,* 680 F.3d at 184 (alteration in original) (quoting *Twombly*, 550 U.S. at 556).  AHS therefore had to put forth specific allegations to answer the basic questions of "who, did what, to whom (or with whom), where, and when."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (citation omitted).

AHS fails to meet this burden.  AHS's complaint does not plead any specific, nonconclusory facts regarding "who, did what, to whom, where and when" that would demonstrate that MultiPlan's 700+ clients came to any agreement or even communicated with one another to do anything.  For example, AHS does not say which personnel from MultiPlan's 700+ co-conspirators allegedly entered into the conspiracy, when those personnel from 700+ clients formed the conspiracy, or what MultiPlan's 700+ clients did to form an agreement.  AHS does not identify a single call, email, or text message between MultiPlan's 700+ clients.  Instead, AHS asks the court to ***presume*** the existence of a conspiracy merely because 700+ payor-clients each chose to purchase MultiPlan's cost-management services, knowing that those services would result in savings for that insurer and its members.  AHS's allegations thus are nothing more than a "bare assertion of conspiracy" that "will not suffice."  *Twombly*, 550 U.S. at 556.

**B.     AHS Does Not Plead Any Direct Evidence Of A Conspiracy**

Unsurprisingly, AHS also fails to plead direct evidence of a conspiracy among MultiPlan's 700+ clients to buy MultiPlan's cost-management tools and services, much less to fix the prices

of OON reimbursements.  Direct evidence of a conspiracy must be "explicit and require[] no inferences to establish" a conspiracy from it.  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).  As numerous courts—including those in this Circuit—have held, pleading the existence of direct evidence of a conspiracy is thus a steep burden that is rarely met because it requires "smoking gun" evidence, such as a "recorded phone call in which two competitors agreed to fix prices at a certain level," *Mayor & City Council of Balt. v. Citigroup, Inc*., 709 F.3d 129, 136 (2d Cir. 2013), or a document in which co-conspirators agree to do something unlawful, *see Ins. Brokerage Litig.*, 618 F.3d at 324 n.23 (noting that direct evidence of a conspiracy may come in the form of "a document or conversation explicitly manifesting the existence of the agreement in question"); *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d 651, 662 (7th Cir. 2002) (holding that direct evidence of a conspiracy is "tantamount to an acknowledgement of guilt").

There is absolutely nothing like that here.  AHS does not plead a single fact showing that any of the 700+ payor-clients of MultiPlan directly communicated with each other to coordinate anything.  *See Twombly*, 550 U.S. at 565 n.10; *Cf. In re Zinc Antitrust Litig.,* 155 F. Supp. 3d at 345, 368, 371, 373.  Nor does AHS allege any sort of acknowledgment by any alleged co-conspirator plan that it entered into a horizontal agreement with any others.  AHS does not say anything *at all* about the vast majority of the 700+ alleged co-conspirators; for the few it discusses, there are no fact allegations showing any alleged horizontal price-fixing agreement between them.

Instead, AHS once again claims that each of MultiPlan's clients entered into individual, two-way supply agreements with MultiPlan, and that, as part of MultiPlan's marketing of its product, MultiPlan employees touted the ways in which MultiPlan's tools benefitted other unnamed clients.  Compl. ¶¶ 101, 103-04.  But allegations regarding a few payors' internal decision-making processes and perceptions that MultiPlan's cost-management tools might benefit

them because they had also benefitted others do not establish an illegal cartel. *Musical Instruments*, 798 F.3d at 1195 ("interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement" and this alone does not amount to evidence sufficient to show a conspiracy).

That AHS continues to portray the existence of lawful, two-way supply contracts between MultiPlan and its clients as *direct evidence* of a conspiracy *between* insurance plans to fix prices betrays both a fundamental misunderstanding of black-letter antitrust law and the meritless nature of AHS's claims.  Indeed, under AHS's view, there would always be direct evidence of a horizontal *per se* conspiracy under a hub-and-spoke theory—and every plaintiff would be able to establish the existence of a "rim"— by virtue of the existence of a series of vertical agreements between the hub and each spoke.  But that is the opposite of what the majority of circuits (including this one) have held, and it is unequivocally not the law.  *See, e.g., PepsiCo.*, 315 F.3d at 109-10 (hub's vertical agreements with distributors were not sufficient to establish a horizontal agreement); *In re: Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at *11-12 (S.D.N.Y. Aug. 3, 2022) (no direct evidence of conspiracy where plaintiffs "rely solely on the vertical agency agreements between each Publisher and Amazon").

## C.    AHS Does Not Allege Any Circumstantial Evidence That Plausibly Excludes That MultiPlan's 700+ Payor-Clients Acted Independently

AHS also fails to adequately allege an agreement via circumstantial evidence.  To support a Section 1 conspiracy based on circumstantial evidence, AHS has to plead facts demonstrating *both* (1) parallel conduct *and* (2) "plus" factors that plausibly tend to exclude the possibility of independent conduct.  *See Mayor & City of Balt.*, 709 F.3d at 136.  AHS does neither.

### 1.    <u>AHS Fails To Allege That 700+ Payors Engaged In Parallel Conduct</u>

To begin, AHS does not identify *any* parallel conduct.  To plead parallel conduct, AHS

was required to allege that the 700+ alleged co-conspirators contemporaneously engaged in conduct so similar that a conspiracy can be inferred—by, for example, showing that competitors adopted similar policies *around the same time*.  *Musical Instruments*, 798 F.3d at 1196.

AHS has not done that.  Although it claims that 700+ alleged co-conspirators purchased some form of MultiPlan's cost-management products and services by dribs and drabs during a 17-year period starting in 2006, AHS does not allege that the vast majority of payors ever subscribed to the same MultiPlan product, or that the 700+ payors allegedly entered into such a contract with MultiPlan at the same time.  *See Mosaic Health Inc. v. Sanofi-Aventis* U.S*., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. Sept. 2, 2022) (policies that were "different in their particulars, their timing, and their outcomes" were not parallel); *see also Park Irmat Drug Corp. v. Express Scripts Holding Co*., 911 F.3d 505, 516-17 (8th Cir. 2018) (plaintiffs failed to plead parallel conduct because alleged actions took place six months apart); *Musical Instruments*, 798 F.3d at 1196 (the fact that competitors adopted similar pricing policies "over a period of several years" was insufficient to plead parallel conduct because the "slow adoption of similar policies does not raise the specter of collusion" ).  That is not parallel conduct.

A recent decision highlights these very issues.  The plaintiffs in *Gibson v. MGM Resorts International* alleged that "at unknown times," the defendants—a group of hotel operators on the Las Vegas Strip—began using software that recommended prices to the defendants, resulting in "higher prices for hotel rooms than the market could otherwise support."  2023 WL 7025996, at *1 (D. Nev. Oct. 24, 2023).  The court granted the defendants' motion to dismiss, noting that the plaintiffs had failed to plead allegations that would allow the court to "plausibly infer that all [defendants] began using particular pricing software at or around the same time," *id.* at *4, and that it was "unclear . . . whether all [defendants] use the same pricing algorithm even though

Plaintiffs allege that [defendants] have colluded to adopt a shared set of pricing algorithms" *id.* at *3.  The court noted that, "[b]etween not alleging what software [defendants] all agreed to use, who entered into any purported agreement, and when they entered into any agreement, the Court cannot infer parallel conduct from the Complaint." *Id.* at *4.

Compounding its inability to show parallel conduct, as was also the case in *Gibson*, AHS actually alleges significant variation in the co-conspirator plans' behavior, including that (1) MultiPlan offers several different cost management products; (2) different payors use different MultiPlan products; (3) payors can and do select parameters in the cost management tools they buy from MultiPlan to yield different pricing recommendations; and (4) payors ultimately depart from MultiPlan's pricing recommendations at least some of the time in terms of what they actually pay providers.  Compl. ¶¶ 11, 63, 68, 74, 76, 85, 102-08, 273-74.  Given this, and the fact that AHS does not allege any facts for the majority of the 700+ alleged co-conspirators that identify which cost management product they used, when they started using it, or how they chose parameters impacting their pricing, AHS fails to plausibly allege parallel conduct between MultiPlan's payor-clients.  *See Gibson*, 2023 WL 7025996, at *4.

## 2.    AHS Fails To Allege The Existence Of "Plus Factors"

On its own, AHS's failure to plead parallel conduct should end the Court's analysis.  It is well settled, including in this Circuit, that "plus factors" are irrelevant to the Section 1 conduct without parallel conduct.  *Mosaic Health*, 2022 WL 4017895, at *7 (citations omitted); *Park Irmat Drug Corp*, 911 F.3d at 517 ("Because [plaintiff] fails to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary.").  Regardless, AHS has not alleged any "plus factors" that suggest that the alleged co-conspirators behaved in a way that was "largely inconsistent with unilateral conduct" when they bought MultiPlan's cost management services.  *See Musical*

*Instruments*, 798 F.3d at 1194.  Nor could it:  it is unquestionably in the unilateral self-interest of every health insurance plan to negotiate OON reimbursements to the lowest price.  *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 235 (2d Cir. 1999) (per curiam) (no conspiracy where conduct was consistent with unilateral legitimate business interests).  AHS's "plus factor" allegations do not show otherwise.

    1.  <u>Opportunity To Conspire</u>.  The complaint alleges that MultiPlan and 700+ alleged co-conspirators had an "opportunity to conspire" because some small portion of the 700+ payor-clients are members of the same trade association, and some of them occasionally attend the same industry meetings.  Compl. ¶¶ 173-85.  But it is well-established in this Circuit that mere participation in a trade association or attendance at industry events is not sufficient to establish an unlawful agreement.  *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019) (allegations that defendant had " 'numerous opportunities to conspire' through its participation in trade associations and plant tours" failed to support inference of a conspiracy).

    2.  <u>Common Motive To Conspire</u>.  AHS also alleges that MultiPlan's 700+ payor-clients share the common desire to keep their reimbursement payments for OON services as low as possible.  Compl. ¶¶ 161-63.  Of course they do.  Every business in America shares the common desire to keep the costs of its business as low as possible.  The common "motive" to increase profits "always exists" among all firms everywhere; it "does not suggest an agreement" and is "insufficient to plead a [Section 1] violation."  *Musical Instruments*, 798 F.3d at 1194-95; *see also Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co*., 917 F.3d 1249, 1263 n.14 (11th Cir. 2019) (holding that, if a common "desire to maximize profits" were sufficient evidence of "a common motive [to conspire]. . . most businesses with similar pricing would be deemed in cahoots with each other because that is the goal of most corporations.").

3. <u>Actions Against Self-Interest</u>.  AHS next alleges that it makes no economic sense why, absent a horizontal conspiracy between and among the insurance plan clients of MultiPlan, those plans would avail themselves of a cost-saving opportunity to pay a lower reimbursement amount to AHS.  But AHS's complaint actually provides the (obvious) answer:  MultiPlan helped each plan and its subscribers save, in total, billions of dollars each year.  Compl. ¶ 13.  The fact that multiple plans reacted in the same way to market forces is not sufficient to plead that each was acting against its own unilateral self-interest.  *Musical Instruments*, 798 F.3d at 1195.

AHS's hodge-podge of arguments to the contrary do not hold up.  AHS speculates that plans would never unilaterally refuse to *overpay* a provider because doing so would make that provider less likely to join that insurer's network.  *See* Compl. ¶ 190.  But this makes no economic sense.  Overpaying a provider for *out of network* services would reward that provider for its decision *not* to join the insurer's network and agree to lower, contracted rates for in-network services.  AHS never explains (nor could it) why any plan would undermine its own network in this way.  Next, AHS posits that, absent a conspiracy, individual plans are motivated to "compete" with each other to pay higher OON reimbursements, in order to ensure that providers do not refuse to treat that plan's subscribers.  *Id.* ¶¶ 189-90.  But this is sheer speculation.  AHS does not allege a single fact showing that it ever refused to treat any patients in order to inspire "competition" between plans to increase OON reimbursements.[6]  *See supra* Section B.  Nor does AHS allege with any facts that plans can better compete for subscribers by overpaying providers for OON services—as opposed to simply marketing to subscribers the plan's ability to help them save

---

[6] AHS's unsupported contention that only a conspiracy explains any plan's decision not to develop an in-house cost management technology to compete against MultiPlan's is similarly implausible. There are obvious reasons why a plan would opt not to vertically-integrate—including the cost of investment relative to expected returns—that have nothing to do with coordinated conduct.

money, or that subscribers prefer plans with higher OON reimbursement payments when choosing between competing plans.  Nor could it:  AHS's theories do not reflect how the real world works.

4.  Information Sharing.  AHS does not actually allege that any of the plans shared competitively-sensitive information *with each other*.  Instead, AHS alleges that plans submit their claims information to *MultiPlan*, which aggregates and analyzes—together with a vast array of publicly available data, including data that providers themselves submit to the federal government—to generate cost-management recommendations.  Compl. ¶¶ 75-78.  AHS never plausibly alleges that MultiPlan provides any of its customers' actual confidential information to any other client in any identifiable way, or that any client can use the result of MultiPlan's cost-management tools and services to ascertain the confidential claims information of any other client. Numerous courts have found similar allegations of "information sharing" via algorithmic technologies insufficient to raise any inference of conspiracy.  *See Gibson*, 2023 WL 7025996, at *6 (dismissing Section 1 claim where plaintiffs merely alleged that confidential information was fed in—but not out—of the pricing algorithm at issue, and finding that plaintiffs failed to allege that "one [alleged co-conspirator] ever receive[d] confidential information belonging to another" as opposed to merely getting "their own confidential information back mixed with public information from other sources"); *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *2-3, 6-8 (N.D. Ill. Aug. 29, 2022) (rejecting claim that a data-aggregating intermediary "facilitated the reciprocal exchange of competitively sensitive market information among" TV broadcasters absent " 'concrete' allegations that the conduit defendant compromised 'the ostensible anonymity' of competitively sensitive information").  So too here.

5. Market Structures:  Having failed to allege a conspiracy any other way, AHS finally falls back on allegations about basic market structure including that the alleged markets are (1)

"concentrated," (2) are conducive to collusion (as evidenced by alleged past collusion), and (3) have high barriers to entry.  Compl. ¶¶ 138-60, 165-70.  None of these allegations are themselves sufficient to imply a conspiracy.  *See Sanderson Farms*, 944 F.3d at 466 (allegations "that the general structure of the poultry market made it 'susceptible to price fixing' " were not themselves sufficient to support the inference that an illegal combination actually occurred).  Count 2 fails.

## III.   AHS FAILS TO PLEAD THAT MULTIPLAN'S SERVICE CONTRACTS HARMED COMPETITION IN A RELEVANT MARKET

Because AHS cannot allege the existence of a single, overarching conspiracy that warrants the application of the *per se* standard as a shortcut to liability, as it tries to do in Counts 1 and 2, it must allege that each individual agreement between MultiPlan and a payor-client violated Section 1.  To do this, AHS must plead, for each bilateral agreement, all of the elements of a standard antitrust claim under the rule of reason, which include relevant product and geographic markets, as well as adverse effects of the conduct on competition.  *Pac. Recovery Sol.*, 481 F. Supp. 3d at 1023-24 (dismissing plaintiff healthcare providers' Section 1 claim, after plaintiffs failed to allege a *per se* horizontal conspiracy to "fix" prices of OON payments, and noting that plaintiffs had failed to allege in the alternative any of the required elements of a Section 1 claim under the rule of reason that would support a claim that each cost-management contract violated the antitrust laws).  AHS cannot adequately plead a single one.  Count 3 thus fails.

### A.   AHS Fails To Plead A Properly Defined Antitrust Market

AHS cannot allege that its claimed relevant market—for "reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services" is a proper antitrust market.  Comp. ¶ 138.  No court has considered and found such a standalone market for the sale or purchase of "reimbursements" in any comparable case.  The legal problems with AHS's claimed "market" start at the very beginning.  Under Second Circuit law, a properly alleged

antitrust market must encompass all products and/or services that have reasonable interchangeability for the purposes for which they are produced. *See City of New York v. Grp. Health Inc*., 649 F.3d 151, 154-55 (2d Cir. 2011). AHS has acknowledged to the Court that it did not even try to do this—its complaint is entirely devoid of factual allegations about what products or services are reasonably interchangeable with "OON reimbursements" from its perspective as a seller. *See* Letter, ECF No. 35 at 3. According to AHS, however, because it provides its patients with a "service" and complains about buyer-side conduct, it did not need to plead interchangeability or substitutability for purposes of alleging a valid antitrust market under Second Circuit's decision in *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001). Letter, ECF No. 35 at 3. But this astonishing claim is demonstrably wrong. As the Second Circuit made clear in *Todd*, a plaintiff attempting to allege a relevant product market in a case alleging a buyer-side conspiracy is not exempt from establishing a market premised on interchangeability of demand; instead, *Todd* held that a relevant antitrust market in a case involving an alleged buyer-side conspiracy must encompasses all competing buyers that are reasonably interchangeable substitutes for the purchase of the relevant good or service, from the perspective of the seller. *Id.* at 202. On top of that, although *Todd* acknowledged that market definition is often a fact-intensive inquiry, the Second Circuit warned that dismissal is warranted if a plaintiff fails to articulate "a plausible explanation as to why a market should be limited in a particular way" or improperly limits the market to a single entity or subset of entities that compete with potential substitutes. *Id.* at 200. That is precisely the test that AHS's artificially constructed market fails here.

   ***AHS's Alleged Market For Out-Of-Network Reimbursements Does Not Exist***. There is a reason why AHS does not (and cannot) put forth any allegations that explain what, if any, buyers would be interchangeable substitutes for AHS in its alleged market. AHS's standalone

"reimbursement" market does not exist.  Indeed, it does not even make sense.  There are no companies that buy or sell "reimbursements" to customers, that compete to provide "reimbursements" to their clients, or that would switch from selling "reimbursements" to selling some other product if the "reimbursement" business were no longer profitable.  That becomes even more clear when applied to the allegations in the complaint.  At its core, AHS is not challenging conduct that impacts competition for its *services—medical treatments to patients.* Instead, AHS is merely challenging the result of the one-on-one negotiations between AHS and an insurance plan that occur *after* AHS has already "sold" its medical services to a patient covered by the plan.  *See, e.g.*, Compl. ¶¶ 230-31, 233, 273-74.  Thus, at the point where AHS and a payor start to negotiate over the best method for payment to AHS, there is no sale of any discrete product by AHS, to any buyer at all at this point post-transaction, much less any "competition" between prospective buyers of that product that could thus form a "market."  At most, AHS's interaction with the health plan is simply a matter of the payment that the bilateral parties (with or without MultiPlan's tools and services) will agree to for a service that has already been bought and sold. This is not a cognizable antitrust "market" comprised of a discrete product or service and the competing entities that buy and sell it—but simply a payment negotiation scheme.

Indeed, no court has recognized, as a standalone matter, a valid antitrust reimbursement-only market based on comparable allegations.  To the contrary, where a court has confronted a similar fact pattern, it has made clear why such a "reimbursement"-only market could not exist. In a case largely indistinguishable from this one, a District Court in New Jersey dismissed Section 1 claims that, like here, alleged a price-fixing conspiracy among plans to suppress OON reimbursements.  *Franco*, 818 F. Supp. 2d at 832.  Like here, the plaintiffs in *Franco* alleged that insurers conspired to fix prices for OON service reimbursements by using a common pricing

database maintained by a company known as Ingenix.  *Id.* at 802.  Rejecting that theory, the court

explicitly observed that a purported "price fixing" agreement among insurer-plans to cap OON

reimbursements "does not pertain to the pricing of anything" and thus could not provide the basis

for a Section 1 claim.  *Id.* at 832.  Instead, the court explained, there was "no indication in the

complaints that coverage of [OON] services [ . . . ] is a discrete product available for purchase and

sale apart from the rest of a subscriber's insurance policy, at its own price."  *Id.*  This reasoning

applies here.  Because OON reimbursements do not reflect any "discrete product available for

purchase and sale," they cannot provide the basis for a valid antitrust market.  *Id.*

   ***AHS Improperly Excludes All Other Buyers For Its Medical Services***.  Nor can AHS save

its complaint by attempting to redefine its alleged market as a relevant market for the purchase of

AHS's services by commercially-insured patients reimbursed on an OON basis.  That market

would fail too.  In recent years, courts have repeatedly rejected alleged healthcare markets that

improperly limit the set of buyers in the market to those with commercial insurance (thereby

excluding patients with government insurance or uninsured patients) where plaintiffs fail to allege

a sufficient justification for doing so.  *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591

F.3d 591, 596-98 (8th Cir. 2009) (rejecting product market comprised of commercially-insured

patients where complaint failed to consider the interchangeability of government-insured patients

from the perspective of the provider-seller, and provider did not allege that it would refuse to

accept payment from non-commercially-insured patients); *BCBSM. v. GS Labs*, *LLC*, 2023 WL

2044329, at *17-18 (D. Minn. Jan. 30, 2023) (provider failed to allege product market when it

failed to allege that it "cannot or refuses to accept payment from sources other than private

commercial insurers"); *Marion Healthcare LLC v. S. Illinois Healthcare*, 2013 WL 4510168,

at *10 (S.D. Ill. Aug. 26, 2013) ("When there are numerous sources of interchangeable demand,

the plaintiff cannot circumscribe the market to a few buyers [] to manipulate the buyers' market share").

To survive Second Circuit scrutiny, AHS thus was required to demonstrate that any alleged product market that it puts forth contemplates all reasonable interchangeable buyers who could pay AHS's fees and whose payments were acceptable to AHS. AHS's complaint fails to do that. Not only does AHS improperly exclude without explanation or factual support all buyers from its alleged market except for commercially-insured patients—as numerous courts have warned provider-plaintiffs against doing—AHS compounds this problem by limiting its alleged market to commercially-insured patients that reimburse AHS *on an out-of-network basis only*. Compl. ¶ 1. This is plainly improper. AHS concedes that it sells its services to many patients insured (or uninsured) in many different ways (not just OON), including: uninsured patients paying out of pocket; patients insured by HMOs, patients insured by in-network plans, and patients insured by government insurance. *Id*. ¶¶ 2-3, 140, 243. All of these buyers demand AHS's services and pay for them, AHS sells to all of them, even if some reimburse differently and in ways that AHS prefers. *See City of New York,* 649 F.3d at 154-56 (district court "correctly concluded that the market alleged . . . is legally insufficient because it is defined by the City's preferences, not according to the rule of reasonably interchangeability and cross-elasticity of demand."). Because these patient-buyers are reasonable substitutes for each other from AHS's perspective as a seller, AHS cannot exclude them from any valid market definition, without a plausible explanation for doing so. It has provided none.

### B. AHS Fails To Allege That Each Of MultiPlan's Bilateral Agreements To Offer Its Cost-Management Tools Was A "Price-Fix" Or Any Restraint Of Trade

Even accepting AHS's alleged market, however, AHS Section 1 claim still fails. Under the rule of reason, AHS must plead that each bilateral agreement between MultiPlan and its payor-

clients was anticompetitive conduct that had an "*actual* adverse effect" on competition in a relevant market.  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004); *In re: Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at *22-23 (having failed to allege horizontal conspiracy, plaintiffs also failed to allege that individual agreements between Amazon and Publishers violated Section 1 under rule of reason).  It does not and, indeed, cannot do so.  AHS fails to allege that MultiPlan and its 700+ clients engaged in any anticompetitive conduct.  The fact that MultiPlan gave its clients the option to use its cost-management tools to calculate OON reimbursements instead of the legacy databases that AHS prefers is not enough.  Insurance plans are free to decide which cost-management products, if any, they want to use.  *Cf. Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) (it is "well established" that businesses should be encouraged to compete to serve as their customers' supplier and the customer is free to contract with whomever they choose).  The insurance plans' choice to move their business away from legacy databases to MultiPlan was a lawful exercise of a customer-plan's "freedom to switch suppliers" that "lies close to the heart of the competitive process that the antitrust laws seek to encourage."  *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 116 n.16 (S.D.N.Y. 2015) (citation omitted).  This is particularly true given there are no allegations that MultiPlan has 700+ agreements with payor-clients all containing any sort of potentially anticompetitive restraint, such as exclusivity terms, or that any plan was mandated by Multiplan to pay any final amount to any provider.  Each payor-client "remains free to pick the supplier [or product] that it believes will provide the best deal," *Race Tires America, Inc.*, 614 F.3d at 79, and each is free to decide what they will pay as a result.  That is not anticompetitive conduct.

### C.    AHS Fails To Allege That Each Of MultiPlan's Bilateral Agreements Harmed Competition In Any Relevant Market

Nor has AHS made any allegations whatsoever that "the competitive structure of the

market . . . has been affected by the decision of a single health insurance plan to reimburse out-of-network providers at lower rates" such as it was required to do to show harm to competition.  Or. at 11, *Long Island Anesthesiologists*.  For example, AHS does not allege *each* of MultiPlan's bilateral contracts increased the market share of any plan or impacted competition between plans. And there are no allegations that MultiPlan's bilateral agreements reduced demand by patient-subscribers for provider services, decreased quality of patients to which AHS must provide medical services to, or resulted in anticompetitive prices in any market—much less that *each* agreement between MultiPlan and its client-plans reduced competition between buyers of AHS's services and yielded anticompetitive effects.[7]  *Virgin Atl. Airways Ltd  v. Brit. Airways PC*, 257 F.3d 256, 264 (2d. Cir. 2001).  Of course, the **opposite** is true:  AHS's allegations show the procompetitive effects of MultiPlan's agreements in the form of *more* cost-management options and *lowered* costs to subscribers, who inevitably shoulder some portion of OON reimbursements and will benefit from lower fees.  *Cf. Compl.* ¶¶ 12, 45, 95, 122, 271; *see also* Or. at 12, *Long Island Anesthesiologists* (allegations that a plan *lowered* reimbursement rates to a provider by using MultiPlan's services was itself insufficient to establish a harm to competition or anticompetitive effects); *Kartell v. Blue Cross Blue Shield of Mass., Inc*., 749 F.2d 922, 925, 929 (1st Cir. 1984) ("[a] legitimate buyer is entitled to use its market power to keep prices down"). Given this, AHS, at minimum, had to allege that MultiPlan could achieve the same procompetitive benefits for its customers and their subscribers through less restrictive means in order to survive dismissal.  *Virgin Atl. Airways Ltd.*, 257 F.3d at 264-65.  It has failed to do that.  The only "injury" AHS complains of is injury to *AHS **itself***—namely, its inability to extract higher prices for its

---

[7] The court need not credit AHS's speculation that lower reimbursement fees could theoretically lead to a decrease in provider care for patients and the financial plight of rural hospitals—AHS does not allege any non-conclusory fact that supports those claims.

medical services pursuant to a payment negotiation in which AHS has apparently failed to justify its own rates to its counterpart. But the antitrust laws protect "competition, not individual competitors" and injury to AHS only "cannot be said to the sine qua non of a [Section] 1 violation." *Id.* at 265; *see also Brunswick Corp v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 488 (1977). AHS's failure to allege harm to anyone but itself is fatal to its claim.

## IV.   AHS FAILS TO PLEAD AN ANTITRUST INJURY

AHS's failure to properly allege anticompetitive competitive effects not only dooms its rule of reason claim, but also mean that AHS cannot establish antitrust injury. In every antitrust case, a plaintiff must allege not only that it personally suffered an actual injury (or impact) from defendant's conduct but also that its particular injury qualifies as an "antitrust injury." *Gatt Communications, Inc*, 711 F.3d at 76. Antitrust injury is an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. Because antitrust laws were enacted for "the protection of competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 319 (1962), an antitrust injury must be one that results from a "competition-*reducing* aspect or effect of the defendant's behavior," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994). Here, there are at least two fundamental problems with AHS's theories that mean it cannot establish antitrust injury.

*First*, in essence, what AHS is seeking is the ability to obtain a **supracompetitive** price for services billed on an OON basis—ones that dwarfs the recovery it obtains for the same precise services when billed on an in-network basis or through a program like Medicare. But the inability to obtain a supracompetitive price is not the type of injury the antitrust laws were meant to prevent. *See, e.g.*, *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 440 (2d Cir. 2005); *see also, e.g.*, Or. at 12, *Long Island Anesthesiologists* (allegations that a plan lowered reimbursement rates by

using MultiPlan's services was insufficient to establish antitrust injury); *Westchester Radiological Associates P.C. v. Empire Blue Cross & Blue Shield, Inc.*, 707 F. Supp. 708, 717 (S.D.N.Y. 1989) ("The law does not prevent a buyer . . . from negotiating a good price").

*Second,* AHS's claimed injury does not result from any competition-reducing effect of MultiPlan's behavior. *Atl. Richfield Co.,* 495 U.S. at 344 (1990). According to AHS, MultiPlan's conduct is anticompetitive because numerous plans have entered into supply contracts with MultiPlan. However, those contracts merely give those customer-plans the ultimate ***option*** to make OON payments that are informed by their use of MultiPlan's cost-management tools. There is nothing competition-reducing about that; payor-clients remain free to reject MultiPlan's recommendations and as AHS's allegation make clear, do so some of the time. And they do so in the context of a one-on-one discussion with AHS, after the patient was seen, where no other payor is "competing" for anything but the discussion is simply about the payment amount.[8]

## CONCLUSION

For the reasons set forth above, the Court should dismiss the complaint in its entirety.

---

[8] This also means that AHS does not have antitrust standing to pursue its claims against MultiPlan because AHS's claimed damages are too remote, indirect and speculative when analyzed in relation to MultiPlan's alleged conduct. *See In re American Express Anti-Steering Rules Antitrust Litig*, 19 F.4th 127, 135, 139-40 (2d Cir. 2021) (the first factor in antitrust standing asks whether "the violation was a direct or remote cause of the injury, "which "turns on familiar principles of proximate causation," such that only "injuries that happen at the first step following the harmful behavior are [] proximately caused by that behavior").

Dated:  December 12, 2023

Respectfully submitted,

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman
Katherine A. Rocco
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1264
Lawrence.Buterman@lw.com
Katherine.Rocco@lw.com

Sadik Huseny (*pro hac vice*)
**LATHAM & WATKINS LLP**
300 Colorado Street, Suite 2400
Austin, TX 78701
(737) 910-7300
Sadik.Huseny@lw.com

Brendan A. McShane (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
Brendan.McShane@lw.com

Anna M. Rathbun *(pro hac vice)*
Molly Barron (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
Anna.Rathbun@lw.com
Molly.Barron@lw.com

*Counsel for Defendant*